```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
                Civil No. 05-2122(DSD/SRN)
```

Equal Employment Opportunity
Commission,

   Plaintiff,

v.                     **ORDER**

KCD Construction, Inc.,

   Defendant.

   Jean P. Kamp, Esq., EEOC, 310 West Wisconsin Avenue, Suite 800, Milwaukee, WI 53203-2292 and Tina Burnside, EEOC, 129 W. Trade Street, Suite 400, Charlotte, NC 28202, counsel for plaintiff.

   Tammy P. Friederichs, Esq., Stephen M. Thompson, Esq. and Friederichs & Thompson, 1120 East 80th Street, Suite 106, Bloomington, MN 55420, counsel for defendant.

   This matter is before the court on defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Based upon a review of the file, record and proceedings herein, and for the reasons stated, defendant's motion is denied.

**BACKGROUND**

   The Equal Employment Opportunity Commission ("EEOC") brought this employment discrimination action on behalf of a class of Hispanic employees against defendant KCD Construction, Inc. ("KCD") pursuant to Title VII of the Civil Rights Act of 1964 and the Civil

Rights Act of 1991.[1] At various periods between 2000 and 2004, KCD employed Francis Soto ("Soto"), Javier Hernandez ("Hernandez"), Humberto Bravo ("Bravo"), Roberto Santos ("Santos"), William Morales Aldoy ("Aldoy") and Efren Romero ("Romero"), the charging parties in this action. The charging parties claim that they were subjected to a hostile workplace during their tenure at KCD that included verbal and physical harassment based on their national origin. KCD is a construction company that engages in concrete work, primarily related to hog holding facilities. The company is located in Slayton, Minnesota, and owned by Ken Doeden ("Ken") and his wife, Joyce. Ken's sons, Chad Doeden ("Chad") and Dennis Doeden ("Dennis"), work for KCD as supervisors and have hiring and firing power.

The majority of KCD's workforce - up to 75% - consists of Hispanic laborers who work on a seasonal basis. (Chad Dep. at 11; Ken Dep. at 12-13.) These employees are laid off during the winter months, but some return and work for KCD during successive summers. Chad and Dennis routinely work alongside the other employees during construction jobs, and Ken typically works from an onsite trailer. At the trailer, KCD posted various employment-rights fliers that

---

[1] As codified in 42 U.S.C. § 2002e-2(a)(1), Title VII provides that it is unlawful for an employer
>   to fail or refuse to hire or to discharge, or otherwise
>   to discriminate against any individual with respect to
>   his compensation, terms, conditions, or privileges of
>   employment, because of such individual's race, color,
>   religion, sex, or national origin.

2

included information about minimum wage and antidiscrimination laws, emergency contacts and job safety and health protection. An Equal Employment Opportunity poster informed workers that they should contact a local EEOC office with any employment discrimination problems. (Friederichs Aff. Ex. 3.) Other than these signs, of which only one was translated into Spanish, KCD had no written employment discrimination policy. (Ken Dep. at 37-38.)

While Dennis likened KCD's work environment to "one big family" and Ken described regularly helping his Hispanic employees by giving them food, clothing and salary advances, the charging parties paint a different picture of working at KCD. They allege daily verbal and physical harassment in the form of racial slurs, hitting, spitting and threats of bodily harm.

Romero, who worked for KCD in 2000 and speaks both English and Spanish, claims that the Doedens harassed the Hispanic employees by calling them "wetback[s]," "motherfuckers" and "lazy motherfuckers." (Romero Dep. at 14-16.) He also claims that Dennis and Chad threw wood and nails at him and other Hispanic employees. (Id. at 14-16, 32.) Sometime during the 2000 season, Romero had an encounter with Chad and Dennis. Romero alleges that after Dennis called him a "fucking lazy motherfucker" Romero told Dennis not to call him names. (Id. at 16.) Dennis responded with

3

more name calling, and he and Chad moved threateningly towards Romero. (Id. at 17-18.) Romero claims he was fired when he told Ken about the incident. (Id. at 15.)

Hernandez, a KCD employee in 2001 and 2004, claimed that Dennis threw rebar and wood at Hispanic employees, shot nails at them with a nail gun and threw nails at them, hit them on the head, spit at them, drove the skid loader at them and pushed portable toilets around with the skid loader when Hispanic employees were inside. (Hernandez Dep. at 51-56.) Hernandez further claims that on one occasion in 2004 Dennis grabbed his wrist, twisted it behind his back and held him to the ground. (Id. at 49-50.) Hernandez, who does not speak English but who has taken some English classes, also alleges that he and the Hispanic employees suffered verbal abuse. He claims that Ken often swore at them. At a job in July 2004, bilingual Hispanic workers told Hernandez that Ken was calling them "motherfuckers."

Soto was a KCD employee in 2001, 2003 and 2004. He worked as a lead for the Hispanic employees because he speaks both English and Spanish. Soto claims that the Doedens subjected him and the Hispanic employees to harassment on a daily basis. (Soto Dep. at 98-100.) He alleges that they called him "Osama," a name that the other KCD employees seized upon, and that they often referred to the Hispanic employees as "wetback[s]," "stupid motherfucking Mexican[s]," "asshole[s]," "motherfucker[s]" and "fucking dumb

4

ass[es]." (Soto Dep. at 47-48, 91-92, 122.) As a translator, Soto relayed these epithets to the other Hispanic employees. (Santos Dep. at 40; Aldoy Dep. at 33-34; Bravo Dep. at 21-24.) Soto claims the Doedens engaged in physical abuse and intimidation as well. He alleges that the Doedens spit tobacco and threw lit cigarettes at Hispanic employees, hit them in the head and threw wood, nails and tools at them. (Id. at 47-48, 117-19, 126-27.) Soto discussed his dissatisfaction over such treatment with Ken and Chad on multiple occasions in 2003 and 2004, but he asserts that any change in the Doedens' behavior lasted no more than a week at a time. (Id. at 84-87.)

Santos, Bravo and Aldoy all worked for KCD during the 2004 season. Each claims that the Doedens harassed the Hispanic employees, calling them "wetbacks," "fucking Mexicans" and "motherfucker[s]." (Santos Dep. at 44-45; Bravo Dep. at 20-22; Aldoy Dep. at 9, 32-33.) Santos alleges that the Doedens grabbed him and that Dennis spit at him. Bravo claims that Dennis got upset with him for speaking Spanish and pushed him on several occasions and also remembers the Doedens throwing nails, cigarette butts and wood at him. (Bravo Dep. at 24-25, 29-30.) Aldoy alleges that Chad threw wood at him and Dennis hit him with equipment. (Aldoy Dep. at 28).

During the 2004 season, a group of Hispanic employees pooled together money and bought a tape recorder to document the verbal

5

harassment they experienced. Different employees carried the recorder over a period of one to two months, recording intermittently for ten to fifteen minutes a day. (Soto Dep. at 209-15.) On the tapes, Ken is heard saying "fucking retard," "Jesus Christ, you guys are dumb," "you dumb fuckers," and "boy, you're lazy," among other things. (Burnside Decl. Ex. 2 at 33-45.) The tapes contain no evidence of racial slurs such as "wetback," but the charging parties claim that the verbally abusive language in the tapes was directed only at Hispanic employees. (See Soto Dep. at 96-97, 106-07; Aldoy Dep. at 37-38; Romero Dep. at 30.)

The Doedens refute all of these claims and argue that they never mistreated the Hispanic workers. Although Ken acknowledged swearing and the veracity of the recorded material, he asserts that it was not directed at the Hispanic workers. Each of the Doedens denied using racial slurs. Further, the Doedens challenge the legitimacy of this action because Romero and Soto are the only charging parties who speak English. The Doedens therefore question the ability of the charging parties to be threatened or harassed when many of them did not understand what was supposedly being said. The Doedens allege that Soto orchestrated this entire action in an attempt to gain a financial windfall from KCD. They claim that Soto spearheaded the purchase of the tape recorder and the EEOC filings - all of which contain the same recitation of alleged discrimination. According to the Doedens, Soto recruited other

workers to join the filings and faked signatures in an attempt to increase the number of workers filing discrimination claims against KCD.

In November 2004, the charging parties filed complaints with the EEOC alleging Title VII violations by KCD.  The EEOC conducted a probable cause inquiry and attempted conciliation before commencing this action in September 2005.  The EEOC argues that KCD violated Title VII by engaging in a pattern or practice of national origin discrimination and tolerating a hostile work environment.  KCD now moves the court to dismiss Romero's claim as time-barred and moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## DISCUSSION

### I. Summary Judgment Standard

The moving party in a motion for summary judgment will prevail if it demonstrates to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).  A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a nonmoving party cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23. Summary judgment should "seldom be used in employment-discrimination cases." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994).

**II. Employment Discrimination Claims**

    **A.  Statute of Limitations**

As an initial matter, defendant argues that Romero's claims should be dismissed because he did not bring a lawsuit within 90 days of receiving his right-to-sue letter and his claims are barred by Title VII's 300-day statute of limitations. A Title VII employment discrimination charge must be filed within 300 days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e-5(e)(1). Unlike private litigants, however, the relevant statute of limitations does not apply when the EEOC brings a pattern or practice suit because such an action is based on evidence of harassment against many employees gathered over a

course of time. See 42 U.S.C. § 2000e-6; see also EEOC v. Mitsubishi Motor Mfg., Inc., 990 F. Supp. 1059, 1083-84 (C.D. Ill. 1998); EEOC v. Scolari Warehouse Mkts., Inc., -- F. Supp. 2d --, No. 04-0229, 2007 U.S. Dist. LEXIS 20719, at *41-42 (D. Haw. Jan. 29, 2007). Thus, individuals with allegations outside of the 300-day period may be members of a pattern or practice claim. However, to the extent that the EEOC seeks specific relief for a charging party, even within the context of a pattern or practice suit, an individual party must comply with the statute of limitations. See Mitsubishi, 990 F. Supp. at 1086-87. Therefore, although a charging party who failed to file within the statute of limitations period is barred from individual recovery, his or her allegations can be considered as evidence in a pattern or practice case.

This is the situation in which Romero finds himself. Romero worked at KCD in 2000 but did not file his EEOC charge until December 5, 2004. Although the EEOC has suggested that Romero may have worked for defendant in 2004 as well, the EEOC has offered no proof of this. Accordingly, Romero's allegations fall outside of the 300-day limitations period set forth in Title VII, and he is barred from any individual recovery in this action. However, the EEOC may properly use Romero's allegations as evidence that defendant engaged in a pattern or practice of discrimination since 2000.

**B.    Pattern or Practice of National Origin Harassment**

Defendant points to deficiencies in each charging party's case and argues that the EEOC has failed to establish a prima facie case of national origin harassment. In a pattern or practice case, however, the EEOC need not show that any specific charging party was the victim of discrimination. See Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 360 (1977). The pattern or practice theory of discrimination allows the EEOC to prevent widespread discrimination, and the relevant inquiry is whether the employer regularly discriminated against a group protected by Title VII. See id. at 360-61. To succeed, the EEOC must establish that defendant's behavior, in the aggregate, supports an inference that defendant had a discriminatory policy - in other words, that it tolerated employment discrimination as part of its "standard operating procedure." See id. at 336.

The EEOC bases its pattern or practice claim on a hostile work environment theory. There are inherent difficulties with this approach, as a pattern or practice theory focuses on widespread discrimination against a protected group while a hostile work environment theory assesses whether harassment to which an individual party was exposed was so pervasive that it affected the terms or conditions of employment. See Mitsubishi, 990 F. Supp. at 1071 (sexual harassment claim); EEOC v. Int'l Profit Assocs., Inc., No. 01 C 4427, 2007 U.S. Dist. LEXIS 19070, at *41-42 (N.D. Ill.

Mar. 16, 2007) (same).  The difference between emphasis on the collective versus the individual, however, does not impact the EEOC's method of proving its pattern or practice case.[2]  To do so, the EEOC must demonstrate by a preponderance of the evidence that an objectively reasonable person would find the existence of a hostile environment of national origin harassment and a company policy of tolerating a workforce permeated with severe and pervasive harassment.  See Mitsubishi, 990 F. Supp. at 1073.  The court finds that issues of fact exist as to whether KCD had a policy of tolerating harassment of its Hispanic employees. Therefore, the EEOC's success on a pattern or practice theory hinges on its ability to establish the elements of a hostile work environment claim.

**C.   Hostile Work Environment**

An employee experiences a hostile work environment when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65,

---

[2] Instead, it is an issue when assessing potential remedies. Injunctive relief is often most appropriate for a pattern or practice case while the individual focus in a hostile work environment claim requires compensatory and punitive damages to make victims whole.  See Int'l Profit, 2007 U.S. Dist. LEXIS 19070, at *45-47.

67 (1986)); Palesch v. Mo. Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000). To succeed on a hostile work environment claim, a plaintiff must show that (1) he belongs to a protected group, (2) he was subject to unwelcome harassment, (3) a causal nexus exists between the harassment and the protected group status, (4) the harassment affected a term, condition, or privilege of his employment and (5) the defendant knew or should have known of the harassment and failed to take proper action. Tademe v. St. Cloud State Univ., 328 F.3d 982, 991 (8th Cir. 2003). If one or more of the people creating the hostile environment are supervisors, a plaintiff need not prove the fifth element. See Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). In such a scenario, a defendant can avoid liability if it can establish that it implemented an effective program for reporting and resolving harassment, the program was available to the plaintiff and the plaintiff failed to take advantage of it. See id. at 806-07.

In deciding whether a plaintiff has demonstrated that the harassment affected a term, condition or privilege of employment, the court looks at all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 843 (8th Cir. 2002) (citing Harris, 510 U.S. at

12

21-23). To avoid imposing "a code of workplace civility," the threshold for actionable harm is high. Id. The harassment must be so intimidating, offensive, or hostile that it "poisoned the work environment." Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 967 (8th Cir. 1999) (citations omitted). The "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not rise to the level of a Title VII violation. Meritor Sav. Bank, 477 U.S. at 67. Rather, the work environment must be "dominated by racial hostility and harassment." Ways v. City of Lincoln, 871 F.2d 750, 754 (8th Cir. 1989).

It is undisputed that the charging parties belong to a protected group. Defendants argue that any treatment experienced by the charging parties was not unwelcome because some of them returned to KCD in successive seasons. The court will not speculate about the reasons - economic or otherwise - that prompted the workers to leave or return to KCD. Soto testified that on multiple occasions during his tenure at KCD he confronted the Doedens and told them on behalf of the other Hispanic employees that they were tired of the abuse and harassment. Romero similarly discussed his dissatisfaction over these conditions with Dennis and then Ken in 2000.[3] At this stage, there is a dispute of fact as to

---

[3] In fact, Romero claims that his complaints prompted Ken to fire him in 2000. Since the EEOC has not asserted a claim of retaliation, however, the court will not speculate as to the cause of Romero's termination.

whether the treatment experienced by the charging parties was unwelcome.

Defendant next argues that the EEOC has not established a causal nexus between the alleged harassment and the charging parties' protected status. The Doedens claim that they did not use racial slurs or direct the copious amounts of profanity at the Hispanic employees. The charging parties, however, testified that the Doedens singled them out for harassment and used terminology such as "wetbacks" and "fucking Mexicans." Such allegations, if true, establish a link between the workers' protected status and the harassing treatment. Further, although the tape recordings do not contain evidence of racial slurs, they are rife with profanity - much of it addressed to "you guys" or "you dumb fuckers," contradicting the Doedens' deposition testimony that they did not swear at the Hispanic workers. The court finds there are factual disputes as to whether the Doedens used racial slurs or verbally and physically harassed only the Hispanic workers.

As to the terms or conditions of employment, the charging parties testified that they endured daily harassment, both verbal and physical, that left them feeling helpless and marginalized. They reported being berated verbally, hit on the head, spit at, shot at with nail guns, driven at by skid loaders and pushed around while in the portable latrines. The Doedens deny these accusations. Therefore, factual issues remain as to whether the

charging parties have depicted a work environment "dominated" by racial hostility and harassment that affected the terms and conditions of their employment.

Finally, defendant argues that the EEOC has not demonstrated that the Doedens knew or should have known about the alleged harassment. However, because the people perpetrating the alleged harassment were all KCD supervisors, the EEOC need not prove this element. See Faragher, 524 U.S. at 807 (1998). Further, defendant had no written harassment grievance policy other than the posters in the trailer, only one of which was in Spanish. To the extent that the charging parties followed the procedures on these posters by filing complaints with the EEOC, defendant is foreclosed from asserting an affirmative defense under Faragher.

Viewing all evidence in a light most favorable to the EEOC, there remain genuine issues of material fact such that summary judgment is unwarranted. Indeed, a host of disputed facts exist with respect to the Doedens' behavior and the charging parties' responses, reflecting the very reason courts are hesitant to grant summary judgment in employment discrimination actions. For these same reasons, summary judgment is not warranted on the EEOC's pattern or practice claim.

**CONCLUSION**

Therefore, **IT IS HEREBY ORDERED** that defendant's motion to dismiss Efren Romero as a charging party and for summary judgment [Doc. No. 69] is denied.

Dated:  April 16, 2007

s/David S. Doty
David S. Doty, Judge
United States District Court
